DIVISION NO. 1, RAILWAY EMPLOYEES' DEPARTMENT OF
AMERICAN FEDERATION OF LABOR, APPELLANT, V.
AMERICAN STATE BANK ET AL., APPELLEES.

FILED MARCH 6, 1925.    No. 22956.

1.  Principal and Agent: TORTS OF AGENT:. LIABILITY OF PRINCIPAL. "A principal is liable to third persons for the torts of his agent when committed in the course and within the scope of the agency, although the principal never authorized, participated in

Division No. 1, Railway Employees' Department, A. F. L., v. American State Bank.

or ratified the tort; but he is not liable where the tortious act was committed, not in furtherance of the principal's business, but for a purpose personal to the agent himself." *Larson v. Fidelity Mutual Life Ass'n,* 71 Minn. 101.

2. Banks and Banking: AUTHORITY OF CASHIER: PRESUMPTION. "While a cashier of a bank is presumed to have all the authority he exercises in dealing with executive functions legally within the powers of the bank, or which are usually done, or held out to be done, by such an officer, still the test is whether the transaction is with the bank and in its business, or with the cashier personally and in his business. As to the former, all presumptions are in favor of its regularity and binding force. As to the latter, no such presumptions arise." *Campbell v. Manufacturers Nat. Bank,* 67 N. J. Law, 301.

APPEAL from the district court for Douglas county: CHARLES A. GOSS, JUDGE. *Affirmed.*

*James E. Rait,* for appellant.

*Brogan, Ellick & Raymond, Congdon & Finlayson* and *I. J. Dunn, contra.*

Heard before MORRISSEY, C. J., DEAN, DAY and GOOD, JJ., and SHEPHERD, District Judge.

PER CURIAM.

On and before February 19, 1920, the plaintiff association had a deposit of $65,000 in the American State Bank of Omaha. In respect of the controversy herein, plaintiff's allegations follow:

"Plaintiff charges that, on or about the 19th day of February, 1920, the defendants, American State Bank as aforesaid, and Marion F. Shafer, Roy E. Karls, Guy Liggett, and Ward E. Shafer, and each of them, with full knowledge of plaintiff's ownership of said money, unlawfully converted the same to their own use and benefit, without the knowledge or consent of the plaintiff and against its will, and thereby the defendants and each of them damaged this plaintiff in the sum of $65,000, no part of which has been

paid except $17,500, leaving a balance of said damage and indebtedness unpaid of $47,500."

Defendants Marion F. Shafer, Ward E. Shafer, and Roy E. Karls, filed separate answers, and each separately, in effect, denied the material allegations of alleged wrong-doing as charged in plaintiff's petition. Defendant Guy Liggett likewise filed a separate answer, wherein he alleged, in substance, that he had no knowledge of the existence of the plaintiff association other than as derived from its petition, and therefore denied all and singular the allegations contained therein, and prayed to be hence dismissed with his costs.

The American State Bank of Omaha, hereinafter called defendant bank, in its separate answer made the same allegation as that pleaded in the petition, as to date and amount of the deposit in defendant bank by S. H. Grace, treasurer, and further pleaded that all of the money so deposited was subsequently withdrawn from defendant bank, in the regular and usual course of business, by S. H. Grace, as treasurer as aforesaid.

When the taking of testimony was concluded, the jury, under the court's direction, returned a verdict in favor of the defendants American State Bank of Omaha and Guy Liggett. The question, however, of the liability of the remaining defendants was properly submitted to the jury, and it returned a verdict against them, namely, Marion F. Shafer, Ward E. Shafer, and Roy E. Karls, for $55,027.43; this sum representing the unpaid principal, with interest, demanded in plaintiff's petition. From the judgment, so rendered on the verdict, the plaintiff association and Roy E. Karls prosecute separate appeals.

The following material facts were established at the trial. S. H. Grace, who had been three times consecutively elected to the position of secretary and treasurer of the plaintiff association, for a period aggregating six years, was called by plaintiff as a witness. Grace testified that, as such official, he withdrew from the defendant bank the

$65,000 which the plaintiff association had on deposit therein, in the usual and regular course of business, by obtaining from the defendant bank three cashier's checks, which were signed for the bank by "Roy E. Karls, cashier," and were made payable to the order of "S. H. Grace, Treas." All of the above cashier's checks are dated February 19, 1920. Two were for $20,000 each, and one was for $25,000, and all were paid by the First National Bank of Omaha, February 20, 1920, February 21, 1920, and February 26, 1920, respectively, as appears by the usual bank stamp of the paying bank. The indorsement of S. H. Grace, treasurer, is on the three cashier's checks, and immediately below his signature appears the signature of Guy Liggett.

Grace further testified that, as such official, he purchased three certificates of deposit from the First National Bank of Council Bluffs, payable to himself as plaintiff's treasurer. One certificate, dated February 19, 1920, is in the sum of $20,000; another, dated March 29, 1920, is in the sum of $25,000; and another, dated April 6, 1920, is in the sum of $20,000, making a total of $65,000 in certificates of deposit so purchased from the Council Bluffs bank, with plaintiff's funds, which had been theretofore deposited in the defendant bank by the association and which were payable to Grace, as treasurer. All of this, in the absence of proof to the contrary, and there is none, Grace had authority to do by virtue of his office. And the defendant bank had no notice to the contrary.

Sometime about the middle of the month of April, 1920, Grace attended the regular convention of the plaintiff association, and there exhibited the Council Bluffs bank certificates for $65,000 to its auditing committee. His report was accepted by the committee, and, before adjournment, the parent body adopted the committee's report and so ratified the purchase of the certificates. When the convention adjourned, about April 25, 1920, Grace returned to Omaha and brought the above certificates with him and placed them in the plaintiff association's safety-deposit

vault in the Omaha National Bank building. It therefore plainly appears that, at this time, all the funds of plaintiff, which are involved here, were in the hands of its duly authorized treasurer and were under plaintiff's control. And there is nothing to disclose that the defendant bank, as such, in the foregoing transactions, transgressed any banking law or any recognized custom of sound banking.

On or about May 17, 1920, according to the evidence of Grace, defendants Marion F. Shafer and Roy E. Karls came to his office in the Bee Building and said they wanted to borrow the $65,000, for a short time, which he held as plaintiff's treasurer. They told him they would make him a present of $500 if he would loan the money to them. On the same, or the following day, they returned and he loaned the money to them, for which they executed their joint note, drawn up by Karls, dated May 17, 1920, payable in 30 days to Grace as treasurer. The note, however, on its face provided that it should not bear interest. When the transaction was closed Shafer and Karls paid Grace $500 as promised. This money he invested in oil stock, not for the plaintiff association, but for himself alone. On this $65,000 note, $17,500 was paid by the makers to plaintiff, from time to time, in varying amounts, From October 1, 1920, to January 13, 1921, as shown by the indorsements. The unpaid $47,500 is the basis of plaintiff's suit.

Marion F. Shafer was at one time president and also a director of the defendant bank, but he ceased to be president June 29, 1919, and ceased to be a director in January, 1921, so that when Shafer and Karls obtained the money of the plaintiff association from Grace, its treasurer, May 17, 1920, Shafer was not president of defendant bank and was not one of its managing officers. Marion F. Shafer seems to have had much influence over Grace. He testified that Shafer told him that he and his brother, Ward E. Shafer, were worth a million dollars, and that the money would be just as safe in his hands as it would be in any bank.

Grace, sometime in September, 1921, was a witness in certain proceedings in bankruptcy, wherein M. F. Shafer & Company were adjudged bankrupts. He admitted that he there testified that, when Shafer and Karls borrowed the money in question, in answer to interrogatories, he testified as follows:

"M. F. Shafer, as I now recall, stated that he needed some available funds for a short period. He says 'You have this certificate of deposit,' he said, 'We will make a present to you of $500 for the use of your money for a short period; your money will be just as safe as in the bank.' * * * Q. And Karls was there at that time? A. Karls was there. I said to him, I said, 'That is a large amount of money, Mr. Shafer; you know the money doesn't belong to me, the money belongs to the Division here.' He went on talking about it, and I asked what security there would be on a loan of that kind. He mentioned a printing plant that was worth a half million dollars, how much money he and his brother, W. E., were worth. I guess he estimated himself, or the two of them, probably, around a million dollars. Q. Did he state they were worth about a million dollars? A. Somewhere around there."

When, in respect to the foregoing transaction, Grace was asked if the prospect of receiving $500, and a certain interest bonus of 2 per cent. out of an interest rate of 6 per cent. running to the defendant bank on a certain loan, was the inducement that caused him to loan the plaintiff's money to Shafer and Karls, he answered: "That partly, and the statement that the bank was none too safe." He also testified that he did not know "whether he (M. F. Shafer) was a director, * * * he was an officer at the bank." And he said he "knew at one time he was president." Some interest was paid on the $65,000 note of Shafer and Karls, but Grace said he was cautioned "about cashing any of the interest checks at the American State Bank for fear that they might learn something about it." As shown by his evidence, and the check exhibits, the above

interest payments were made by checks of "M. F. Shafer & Company," and some of the checks were countersigned by M. F. Shafer and some by W. E. Shafer, and they were indorsed and deposited by Grace in some other bank pursuant to the foregoing agreement. In respect of the payments on the principal sum of the $65,000 Shafer-Karls note, aggregating $17,500, Grace testified that this money was paid by cashier's checks drawn on the Omaha National Bank as above noted, and "turned over to the plaintiff." Grace admitted that there was a deficit of $47,500 in his account with the plaintiff association, and that he was no longer its secretary and treasurer. From the evidence of Grace, and it is not denied, it appears that, from its earliest inception, the plan of Shafer and Karls was to transfer the money of the plaintiff association from the defendant bank. But he testified that he did not know where the money was to be placed, because "they didn't mention any particular place at that time."

D. C. Geiselman, former assistant cashier of defendant bank, became cashier April 12, 1920, as Karls' successor. On the part of plaintiff, Geiselman testified: "Q: Mr. Karls severed his connection with the bank sometime prior to that time? A. Some few days, I think. Q. And has not been connected with the bank since? A. Not whatever." He further testified that he never saw the Council Bluffs certificates before the trial, and, so far as he knew, the defendant bank never had anything to do with their purchase.

Clearly, Karls was not in harmony with the managing officers of the bank. And the Shafers were in collusion with him to do the bank injury. In respect of the transaction under consideration, Karls acted without authority, and, so far as the record shows, without the knowledge of the bank's managing officers. On this point the court properly held that whether the Shafers and Karls had evolved a conspiracy "to rob this Division No. 1 and its amiable treasurer of $65,000" was a question for the jury.

The case was therefore submitted by the court on the question of Karls' and the Shafers' liability, and, after being properly instructed on the question of conspiracy, the jury, as above noted, found against them.   Nothing in the record has been pointed out to show why the verdict of the jury should be disturbed.

Plaintiff's counsel further argue:   "Karls and Shafer knew that Grace was in their power when he first yielded to temptation and accepted the offered bonus, and, in all their subsequent dealings with him, they knew that they at all times could take possession of the moneys in his hands. They permitted him to exhibit these certificates simply to lull the appellant into slumber."   And referring to Karls, and his relation to the defendant bank, plaintiff in its brief designates him as "its perfidious cashier."

What are the distinguishing characteristics of a perfidious person.   Obviously, he is one who is treacherous, traitorous, and false.   Can the thought be entertained that such an one, as cashier of a bank, who is shown to have actively participated in the well-planned and successfully executed conspiracy, which the record discloses, was acting in good faith and in the interest of the bank while engaged in the development and the perpetration of the conspiracy? Clearly not.   The undisputed facts speak for themselves. And it does not appear that the managing officers of the bank knew or, in the exercise of reasonable diligence, could have discovered the perfidy of the cashier.   For aught that the record shows, the conspiracy was undiscovered until the ugly facts were disclosed by the plaintiff's treasurer at the trial.   It is always the part of conspirators to conceal their evil acts, and the conspirators here acted well their disloyal part.

As tending to show the influence of the borrowers of the $65,000 over a man of Grace's confiding personality, it may be observed, as above noted, that Marion F. Shafer represented himself to be an officer of the bank at the time, and that he and his brother were men of great wealth; and

that Karls held a responsible and influential position in the business circles of a metropolitan city. Naturally, these men of reputed wealth and high position exercised a great influence over the trustful Grace. Knowing this, they worked on his vanity, to the end that they might ultimately cause him to give up the money. He could not withstand their blandishments. He was a good-natured man and he desired to please. He could not say no. He was so overpowered by the influence of stronger men, whom he believed to be both rich and influential, that he forgot the duty which he owed the parent association, which had thrice honored him with an office of trust and great responsibility. His surrender was complete. He weakly permitted Shafer and Karls to loot the fund which he held for plaintiff in a fiduciary capacity. For a mess of pottage, Grace sold his birthright and betrayed his brethren.

The court held, and we find, that there is no evidence to connect Liggett with any wrong-doing in the premises. After the money passed through the First National Bank of Omaha, by his checks, all of it came into the hands of Grace, as treasurer of the plaintiff association. In the language of the trial court: "The evidence is not sufficient to prove that he had any guilty knowledge of any plan on the part of these parties to obtain the money and convert it."

Plaintiff contends that the defendant bank accepted, and has retained, the benefits of the illegal acts of Karls and Grace and has profited greatly by the transaction. The argument is that, if the bank was guilty of converting the money in February, 1920, it then became indebted to plaintiff for the amount converted, and nothing but payment would satisfy plaintiff's claim. But, as hereinbefore pointed out, there is no evidence to show that any of the managing officers knew anything about the conspiracy which was perfidiously concocted and unlawfully perpetrated by Karls and the Shafers.

And even though Karls was the cashier during all of the

time that he and the Shafers were collusively and fraudulently acting together, as disclosed by the record before us, it is obvious that he was not acting for the bank, nor in its interest, but was acting for himself and those in collusion with him. In such case the defendant bank cannot be holden for his acts. A statement of the rule follows:

"A principal is liable to third persons for the torts of his agent when committed in the course and within the scope of the agency, although the principal never authorized, participated in or ratified the tort; but he is not liable where the tortious act was committed, not in furtherance of the principal's business, but for a purpose personal to the agent himself." *Larson v. Fidelity Mutual Life Ass'n*, 71 Minn. 101. See *Merchants Nat. Bank v. Lovitt*, 114 Mo. 519.

In *Campbell v. Manufacturers Nat. Bank*, 67 N. J. Law, 301, this is said: "While a cashier of a bank is presumed to have all the authority he exercises in dealing with executive functions legally within the powers of the bank, or which are usually done, or held out to be done, by such an officer, still the test is whether the transaction is with the bank and in its business, or with the cashier personally and in his business. As to the former, all presumptions are in favor of its regularity and binding force. As to the latter, no such presumptions arise."

Plaintiff points out that certain collateral notes, of doubtful value, approximating $30,000 in face value, which were held by the defendant bank, apparently as security for a Shafer & Company loan, were paid off and discharged by two drafts which were brought to the bank by Ward E. Shafer, which are dated February 8, 1920. They are payable to "Roy E. Karls," and are indorsed "Roy E. Karls," and were paid March 1, 1920. Plaintiff contends that Karls purchased them with money taken from the funds of plaintiff and that this transaction was a direct benefit to the bank. D. C. Geiselman, assistant cashier at the time, testified that he did not know where the drafts came from,

other than that they were brought to the bank by Ward E. Shafer, and that he did not have any knowledge or any suspicion that this was any of the plaintiff's money. It may here be noted that the plaintiff association held a certificate of deposit issued by the defendant bank, in the principal sum of $65,000, which is dated December 30, 1919, and stamped "Paid" by the defendant bank May 5, 1920. At this time, and between these two dates, it does not appear that any other funds of the plaintiff association were in the hands of the defendant bank.

Reversible error has not been shown. The trial court did not err in denying a new trial. The judgment is ·

AFFIRMED.