JOSEPH SIC ET AL., APPELLEES, v. LOUP RIVER POWER DISTRICT, APPELLANT.

286 N. W. 700

FILED JUNE 27, 1939. No. 30560.

*C. N. McElfresh* and *August Wagner*, for appellant.

*Cook & Cook* and *Abbott, Dunlap & Abbott, contra.*

Heard before SIMMONS, C. J., EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ., and KROGER, District Judge.

MESSMORE, J.

Plaintiffs brought this action in the district court for Dodge county, to set aside two separate options and easements for a transmission line across their land in Dodge county, and to enjoin defendants from going upon the premises for any purpose. The trial court found that the right of way options, granted by plaintiffs to defendant to convey perpetual easements for a transmission line across plaintiff's land, should be canceled and vacated, and that the two grants of easement should be vacated and canceled, and the court refused to grant the injunction, without prejudice to the rights of defendant to institute condemnation proceedings. Defendant appeals, contending that the findings and decree of the court are not sustained by the evidence and are contrary to law. The alleged representations, hereinafter referred to, were made to plaintiff Joseph Sic. His wife Bozny signed the instruments in question, but did not testify, and therefore, for convenience, we will refer to Joseph Sic as the plaintiff.

Plaintiff's cause of action is based upon false and fraudulent representations, alleged to have been made to him by agents of defendant, upon which he relied to his damage, in procuring from him the options and grant of easements for the construction of a transmission line across his land. The petition sets out in detail facts constituting the alleged fraudulent representations, which will appear later in the opinion. The defendant's answer is a general denial, and alleges full payment of the purchase price and estoppel.

The plaintiff, a farmer, of Bohemian extraction, 57 years of age, and with limited schooling, resided with his wife and family on the west half of section 35, township 18 north, range 6, east of the 6th P. M., in Dodge county, Nebraska, which land he has owned since 1918. He also owns the southwest quarter of section 31, township 13 north, range 7, east of the 6th P. M., in Dodge county. The west half of section 35 runs north and south. There is a fence six or eight feet south of the half-section line of section 35, extending for about 60 rods from the west side towards the east. The land is bottom land and tillable, and is planted generally to wheat. Section 31 is about three miles east of section 35. One Floyd Snover owns the quarter-section north of plaintiff's quarter in section 31. There is a fence on the half-section line between plaintiff's and Snover's land, and immediately south of this fence there is a private drainage ditch, occupying a strip about 30 feet wide. One hundred acres of the quarter-section in thirty-one is tiled.

The evidence discloses that one Clark, an agent of defendant, called on the plaintiff at his home on section 35 in January, 1937, introducing himself as representing the government, for the purpose of securing an option for an easement for the construction of a transmission line across part of the plaintiff's land. This meeting took place in the plaintiff's barn. There was some talk as to where the transmission line would be constructed. The plaintiff pointed out from the barn where the fence line was located, and said the fence line was approximately on the half-section line, and Clark said: "That is where they are building the line is along the half-section line." The plaintiff stated that there was some discussion as to his land in section 31. He described the lay of the land, and Clark said the line "would go on the north side along the fence line" on plaintiff's property in section 31, which would be along a private drainage ditch, south of the fence line on section 31, but which would not be on the cultivated land. The option was procured, signed and acknowledged on the 28th of January, 1937. It provided for the grant of a perpetual easement to the de-

fendant of plaintiff's land in section 31 for four two-pole structures, on cultivated land, for the sum of $15 per structure. While the testimony of Clark is not clear as to just what he did tell the plaintiff, we conclude from a reading thereof that it is substantially a denial of plaintiff's testimony. Clark, from his statement, was not on section 31, the land upon which he claims to have obtained the option. He denies the discussion as to the approximate location of the transmission line, and that the fence with reference to the half-section line was pointed out to him. He states that he knew nothing of the private ditch, as mentioned by plaintiff, and testifies that a blueprint was attached to the option which he showed to the plaintiff.

A week or so after this meeting, the plaintiff had a conversation with Roy Cusick, an agent of the defendant, whom the plaintiff had known for 25 years, and with whom he had transacted banking business for a number of years. Cusick stated, in substance, that the government was putting through a line, and plaintiff discussed with him the option on section 31 in regard to the location of the line. Cusick said it would be right next to the ditch. This option was signed and acknowledged in the forepart of February. Both options are identical in the language used and the price to be paid. The written options disclose that Clark obtained the option with reference to section 31 and Cusick the option with reference to section 35. Cusick testifies that he had known and had transacted business with the plaintiff for a period of years, when Cusick was in the banking business; that he told plaintiff the approximate location of the transmission line, as shown on the map, a blueprint attached to the option; that the line could not be on the half-section line where parties might own land on either side, as the crossarms on the poles are eight feet long and would extend over onto the other party's land; that in any analysis the transmission line would have to be eight feet south of the half-section line; that the option was either read to the plaintiff and his wife, read by them or explained to them. The point is made that if the plaintiff had been talking with

reference to section 35 the conversation about the cross-arms extending over onto another person's land would not have occurred, for the reason that the plaintiff owns the entire half-section in thirty-five, and the crossarms on the poles, if located along the half-section line, would not extend onto another person's land. It is true that Clark is the first man whom plaintiff met with reference to the transactions.

The testimony of the plaintiff as to the procurement of the options by Clark and Cusick is directly in conflict with the written options. The options are, ordinarily, in triplicate and attached to each of them is a plat, drawn to scale 1/10 inch to 1,000 feet, showing the approximate location of the transmission line to be constructed across the land, with a blueprint of the land, and yellow perpendicular lines appear, indicating the number of structures. These yellow lines on the exhibits are in practically the same relative position, with the exception that at section 31 one exhibit shows the yellow line closer to the section line than do the others. No copies of the options were left with the plaintiff, and plaintiff testifies that no blueprint was ever seen by him, or attached to the options. The original preliminary survey of the premises was made in the forepart of February. Laths and small rags were used to designate the course of the construction. Much dispute arises as to the visibility of such markers or tokens. The plaintiff states that he was unaware of the preliminary survey made in February, and that he had no direct knowledge of the course of construction of the transmission line until December, when he saw men digging the holes for the placing of the poles. The actual position of the structures was located by the field men in August, September or October of 1937, and from the early part of February, according to plaintiff's testimony, considerable snow remained on the ground until March, and he was sick for a period of time; he did notice some surveyors in September who told him that the survey was preliminary. As soon as he discovered where the line was to be located he tendered back the amount paid for the options and grants of easement which were obtained by Cusick on the 22d of

July, 1937, in the total amount of $120. The transmission line is now completed.

The evidence with reference to the survey discloses a disputed question of location of the corner of the section line in section 35 and the location of the transmission line on said section, with reference to the section line. Defendant's testimony is to the effect that the center of the transmission line is 27 feet south of the half-section line. The plaintiff states that his fence is eight feet south of the section line, and he contends that the transmission line was located 74 feet south of the half-section line on section 35, 80 feet south of the half-section line on the west side of section 31, and 90 feet south at the east side of section 31. Some of the tile in the drainage ditch was destroyed.

If the power line had been placed along the half-section line and along the ditch bank in section 31, it would not in any manner have interfered with farming operations, for the reason that it would have been between the half-section line fence and the private ditch. As the line is now constructed, according to plaintiff's view of the testimony, it is approximately 80 feet south of the fence line. In section 35 the line fails to follow the fence line, which extends 60 rods across the half-section. The inconvenience occurs in the southwest quarter, where the transmission line is some 70 feet south of the north line of the quarter.

The representation as to the location of the transmission line across the plaintiff's land is a material representation upon which plaintiff had a right to rely as reflecting the truth. By the use of the term "approximate," it is true, some variation in the construction of the line across the plaintiff's premises might be expected, but from the testimony it is obvious that the transmission line extends out from the half-section line a distance which is more than an approximate location. It is apparent from the evidence that the plaintiff, Clark and Cusick and defendant's engineers did not know definitely the location of the transmission line at the time the options were procured, and in July, when Mr. Dever, an engineer for the defendant, and Mr.

Cusick met the plaintiff in the field, some four miles from his home, to procure his signature for the grants of perpetual easements, they did not, if they knew the location of the line, so inform the plaintiff. From all of the facts and circumstances in reference to the representation made as to the location of the transmission line, we conclude that the trial judge was right in his findings.

The plaintiff's testimony is to the effect that both Clark and Cusick represented themselves as procuring options for the building of a transmission line for the government. In a measure, it is true that a government project was involved, and it is true that a government official does have jurisdiction over the amount of damages to be paid. Clark and Cusick further represented, according to plaintiff's testimony, that the maximum the government allowed was $15 per structure; that in the event this figure was not accepted the land would be condemned and the matter would probably be carried to the district court and the supreme court. Both Clark and Cusick deny that such representations or statements were made. The plaintiff claims further that Cusick and Clark told him that all of the farmers along the line had signed up on such a basis. It is true that most of the farmers did sign, but not all of them.

As to the effect of representations of this character, a great deal depends upon to whom the representation is made and the circumstances under which it is made. In this instance, it was made to a farmer of foreign extraction, one who had no other occupation or business than that of farming. He is a man of limited education, his schooling not having extended beyond the fifth grade. He was unacquainted with the true facts, and if a representation should be made to him that certain requirements of the government must be met by him, he would be more prone to believe that not to accept might involve him in extensive litigation. Under such circumstances, the representation, if made, is material, and, if relied upon as being true, its effect as an inducement to sign the options is apparent. The trial judge so found.

The plaintiff further testifies that Clark told him there was no danger in the poles; that they would be high enough so there would be no danger at all, and plaintiff could farm around them; that Cusick told him there was no more danger in the transmission line than in the line that passes in front of his place. Most of the testimony with reference to this representation is reflected in the following answer given by Cusick: "A. As far as exact words, I would say that it wasn't any more dangerous than a 3600-volt line that passes down in front of your place because of the construction of this line it would stand up longer in a storm, wouldn't be so apt to fall down and coming in contact with a 3600-volt line would kill him then anyway and I don't believe there is any more danger in this line than there is in a 3600-volt line going past his land on a one pole line." The line in question is 115,000 volts.

In the instant case, the defendant's agents were engaged in procuring options and easements for the purpose of building a transmission line across certain lands, and unquestionably they would be asked about the danger, if any, from the line as being constructed. Such inquiry did develop. The defendant's agents were in a position to know something about the line; they made a representation as to the danger, or lack thereof, and the knowledge, intelligence and relationship of the respective parties are obvious in so far as the effect of the representation is made as an inducement to procure the options and easements. We will not here review the testimony as to the danger, or lack thereof, as disclosed by the record, but in conclusion will state that, from the record, the trial court's finding with reference thereto will not be disturbed.

When the evidence on material issues so conflicts that it cannot be reconciled, "this court will consider the fact that the trial court observed the witnesses and their manner of testifying, and must·have accepted one version of the facts rather than the opposite." *Shafer v. Beatrice State Bank,* 99 Neb. 317, 156 N. W. 632.

"Fraud in equity includes all acts, omissions, and con-

cealments which involve a breach of either legal or equitable duty, trust or confidence justly reposed. Thus in some transactions equity may impose a higher measure of duty than is required at law with regard to the disclosure of matters of which one party is ignorant." 21 C. J. 114.

The court stated that the price of $15 per structure was grossly inadequate. There is no doubt that the defendant has a right to drive a bargain, and it is true that mere inadequacy of consideration is not sufficient, even in equity, to warrant the setting aside of a contract. The consideration, be it more or less, is held at law to support the contract. But, under the circumstances as disclosed by the evidence in this case, where the inadequacy of the consideration is so connected with the circumstances or the misrepresentation as to afford strong, if not conclusive, evidence of fraud, it may furnish the ground for relief. This principle of law the trial court evidently had in mind. See 13 C. J. 612.

"A person is justified in relying on a representation made to him in all cases where the representation is a positive statement of fact, and where an investigation would be required to discover the truth. *Foley v. Holtry,* 43 Neb. 133, followed." *Perry v. Rogers,* 62 Neb. 898, 87 N. W. 1063.

"While it is not the function of the courts to make contracts for parties, or to relieve them from the effects of bad bargains, nevertheless where the simplicity and credulity of people are taken advantage of by the shrewdness, overreaching, and misrepresentation of those with whom they are dealing, and they are thereby induced to do unwittingly something the effect of which they do not intend, foresee, or comprehend, and which, if permitted to culminate, would be shocking to equity and good conscience, a court of equity may with propriety interpose." 4 R. C. L. 502, sec. 16.

"Equity will not refuse to set aside a contract when it plainly appears that one party overreached the other, and gained an unjust and undeserved advantage which it would be inequitable and unrighteous to permit him to enforce,

although the victim owes his predicament largely to his own stupidity and carelessness." *Stone v. Moody,* 5 L. R. A. n. s. 799 (41 Wash. 680, 84 Pac. 617).

The foregoing principles of law are applicable to the case at bar.

For the reasons given herein, the judgment of the district court is

AFFIRMED.