CLYDE LINCH, APPELLEE, V. CARL H. CARLSON, APPELLANT.

56 N. W. 2d 101

Filed December 19, 1952.   No. 33197.

*Mothersead, Wright & Simmons,* for appellant.

*McGinley & Lane* and *Holtorf & Harris,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought by Clyde Linch as plaintiff in the district court for Scotts Bluff County, against Carl H. Carlson, defendant, to recover damages for fraud alleged to have been practiced on the plaintiff by the defendant, based on false representations as a material inducement for the plaintiff to enter into a contract with the defendant for the sale of land and assignment of school land leases. The issues were submitted to a jury resulting in a verdict for the plaintiff, fixing his recovery in the amount of $2,894.07, which is the amount of irrigation assessments on the school land leases in Section 36, less $1,000. The defendant filed a motion for new trial which was overruled. From this ruling the defendant appealed.

The defendant assigns as error that (1) the court erred in overruling the motion of the defendant for a directed verdict made at the close of plaintiff's evidence; (2) the court erred in overruling the defendant's motion to set aside the verdict and to enter a judgment in favor of the defendant notwithstanding the verdict; and (3) the court erred in sustaining objections to the testimony of the witness Paul Rhodes and the offers of proof made by the defendant with reference to telephone conversations had between this witness and attorney Sandhouse of Sterling, Colorado, acting for the plaintiff, touching upon delinquent irrigation assessments against the school land leases involved in this action.

The plaintiff's amended petition, insofar as necessary to consider in this appeal, alleges that the plaintiff was induced to enter into a contract for the purchase of the 4-P ranch near Bridgeport, Nebraska, by reason of representations of the defendant and defendant's agent, Calderwood, that a part of the real estate being transferred to the plaintfif was subject to some delinquent

irrigation taxes; that the same would not amount to much, and would not exceed $1,000; further, that the unpaid irrigation taxes were being canceled in any event by the irrigation district as to the land because the land could not·be irrigated under the dam; that the representations so made by the defendant were false when made and made with the intention that the plaintiff would rely thereon; and that without the knowledge of the falsity thereof the plaintiff did rely thereon to his damage in the amount of the unpaid irrigation taxes.

The·defendant's answer was a general denial.

For convenience we will refer to the parties as designated in the district court. H. M. Calderwood will be referred to as Calderwood, the plaintiff Clyde Linch as Linch, and the defendant Carl H. Carlson as Carlson.

The record discloses that Calderwood, a real estate agent of Sterling, Colorado, was acquainted with Linch and had sold him the Tamarac ranch in 1944. He had heard through a Mr. Johnson that Carlson had a ranch for sale. Johnson and Calderwood went to see Carlson about the ranch. Arrangements were made by Calderwood to represent Carlson as his agent to sell the ranch. This was in the latter part of May 1948. Calderwood knew that Linch was in the market for a ranch. He contacted Linch and they went to the ranch on June 3, 1948. Calderwood priced the ranch at $90,000, and indicated it would be difficult to tell in going over the 6,000-acre ranch in a period of two hours what its value would be. The ranch is described as a prairie ranch with no meadows on it. In addition to the deeded land the ranch consisted of four school land leases in Section 36 which would be assigned under the contract by Carlson to the plaintiff. One of the leases would run 12 years, the second 15 years, the third 16 years from the date of the contract, and the fourth was not involved in this action and not subject to unpaid irrigation assessments. Twenty-five and one-half acres of the school lease land had been leveled and was actually irrigated.

After viewing the ranch Calderwood contacted Carlson in Alliance and informed him he had a buyer, but such buyer did not believe the ranch was worth $90,000. He suggested that Carlson talk the matter over with Linch, which was done, and they arrived at a figure of $87,500 and went over the terms of the sale. Calderwood then asked Carlson if he desired to close the deal in Bridgeport or Colorado. Carlson desired to close it in Colorado, as he did not want Mr. Beltner, from whom he had obtained the ranch by contract, to know he was selling it until the deal was consummated. Linch and Carlson met in Calderwood's office in Sterling, Colorado, and at Calderwood's suggestion they proceeded to the office of attorney Sandhouse who had represented Calderwood for some time. Calderwood had supplied the data for the contract which he had received from Carlson. Sandhouse drafted the contract. Both Linch and Carlson read it and agreed it was satisfactory. It was handed to Linch who signed it, then handed to Carlson who said he would take it home and have his wife look it over before he signed it. At that time no discussion was had about irrigation taxes on the school lease land in Section 36 within the boundaries of the irrigation district. There was some discussion about delinquent irrigation taxes with reference to Sections 24 or 25. Linch did not employ Sandhouse in any manner in writing up the contract or subsequently when a rider was attached to it. Sandhouse was paid by Calderwood for drafting the contract. It was arranged that Calderwood would go to Carlson's home in the evening and pick up the contract. He went to the ranch and contacted Carlson. Carlson said there was something Sandhouse had left out of the contract; and that there was a definite clause in the contract he had with Beltner that Beltner would not be responsible for unpaid water taxes. He said he would have to have that in this contract.

On his way home from Sandhouse's office Carlson had contacted Paul Rhodes, who acted as his attorney, with

reference to a rider to the contract. Rhodes also represented the Northport Irrigation District. The rider to the contract provided that Carlson was not bound by the terms of the contract to pay any delinquent irrigation assessments there might be on school lease land in Section 36, Township 21, Range 50, and the same should not be considered a defect or cloud on the title pursuant to the terms of the contract. The rider then provided: "I am signing this contract providing that Clyde A. Linch of Big Springs Nebr., Will acknowledge this rider *pretaining* to *th* unpaid delinquent *irregation assessements* in Section 36 Township 21 North Range Fifty, West of the Sixth Principal Meridian, in Morrill County, Nebraska, on the School Lease land that is not under cultivation but is under these assessments." The rider was signed by Carlson and witnessed by Calderwood. In addition, the rider provided that if the contract was not signed by Linch it would then be null and void and the check for $2,500 paid down by Linch would be returned to him.

Calderwood informed Carlson he did not believe Linch would sign the contract with the rider attached, but he would try and see what he could do. Carlson then told Calderwood that the taxes would never have to be paid, and they would not amount to much, not to exceed $1,000. He said the ground could not be irrigated, and that these taxes had not been paid for 20 years. Calderwood saw Linch the next day, June 8, 1948, in Ogallala, and told him Carlson would not sign the contract without attaching a rider to it, and Calderwood repeated what Carlson had told him, in substance as follows: That this land probably would not be taxed, and that they had a man down in Washington (it appears that this man was Paul Rhodes who represented the Northport Irrigation District) to try and take this land out of the taxes. The taxes had not been paid for 20 years, and if they did have to pay the taxes it would not be taxed as irrigable land and would probably amount to less

than $1,000. Linch said that nobody could tell whether the ranch was worth $87,500 or $88,500. Calderwood then told Linch that if he did not want to sign the contract to see an attorney. Linch said that an attorney would not know any more about the irrigation assessments than Carlson. Linch signed the rider, but did not acknowledge it before a notary public.

The witness Fred Beltner, who by contract sold the 4-P ranch to Carlson, testified with reference to the unpaid irrigation assessments and the conversation he had with reference thereto with Carlson in 1943, and at other times, and that to his knowledge there was better than $13,000 against the school lease land that was not paid.

Linch testified that he first met Carlson June 3, 1948, at Alliance. Calderwood was present at the meeting. He intended to purchase the 4-P ranch from Carlson and paid down $2,500, and a notation was made of the price. Arrangements were made to meet on June 7, 1948, at Calderwood's office in Sterling, which meeting was held, and Carlson supplied the terms of the contract. At Calderwood's suggestion they proceeded to Sandhouse's office where the contract was drafted. There was some conversation concerning delinquent taxes on irrigation assessments with reference to the deeded land in Section 25. Nothing was said about unpaid irrigation assessments on the school lease land in Section 36. He did not employ Sandhouse nor pay him. Sandhouse had examined the abstracts with reference to the purchase of the 4-P ranch, and that was all. He next saw Calderwood on June 8, 1948, in Ogallala. Calderwood informed him that he had gone to Carlson to pick up the contract and Carlson had attached a rider thereto to conform to the contract Carlson had with Beltner which he felt he had to have before he could make the sale. Calderwood argued to some extent with Carlson to the effect that the contract had already been made and he did not feel that Linch would go through with the deal.

Calderwood then stated to Linch that Carlson said that was more or less immaterial, and Calderwood felt the same way about the transaction, that the school lease land was non-irrigable, it was to be removed from taxation, and in any event the taxes would not amount to more than $1,000. Linch said that was the extent to which he would go in the deal, and he purchased the 4-P ranch, believing that with a ranch of that size it would be difficult to tell whether it would be worth $87,500 or $88,500.

Linch testified further that he had no knowledge of and made no investigation to ascertain information on the unpaid irrigation taxes. He first learned of the same about two weeks after June 4, 1948, when he obtained the information from Fred Beltner. He later made a verification as to the amount of unpaid assessments on the school lease land, Section 36. The taxes existed as a lien on Section 36 and went as far back as 1922. The Northport Irrigation District brought an action against Linch in the district court for Morrill County to foreclose the taxes and obtained a decree of foreclosure for the amount of the irrigation assessments on the school land leases heretofore mentioned. Linch also testified that possibly Sandhouse did talk to Rhodes over the telephone from Sterling to Bridgeport. He did not know, as he did not talk to Sandhouse about the unpaid irrigation taxes on Section 36. He thought the taxes would be taken off completely.

The defendant Carlson testified that Calderwood was his agent for the sale of this land and that he informed Calderwood that there was over $10,000 worth of delinquent irrigation assessments on the school lease land. He did not believe it was worth it, and if he was responsible for this amount he would not go through with the deal. He denied that he ever told Calderwood that these taxes would not exceed, in any event, $1,000. He testified that he had the rider at the house, and that if Linch did not care to sign the rider the deal was off. He

also testified that he remembered testifying in a suit by Fred Beltner in 1950, to recover $6,500 paid to Carlson on the unpaid irrigation assessments on the school land leases. He admitted he knew of the unpaid irrigation assessments on the school land in 1946. He also testified that neither on June 3 nor June 7, 1948, did he tell Linch or Calderwood that there was $10,000 unpaid assessments on Section 36, and that he knew that prior to June 3 the delinquent irrigation assessments on this tract were in excess of $10,000. Further, that he gave information to Sandhouse on the unpaid assessments due with reference to the deeded land, but he did not give any information on the school land leases because he did not think they were important until he talked to Mr. Rhodes and read the contract the second time. He testified that he then told his agent Calderwood to inform Linch about these assessments.

There also appears in evidence the testimony of the witness Rhodes, attorney for the Northport Irrigation District, with reference to telephone conversations had between attorney Sandhouse of Sterling, Colorado, and himself, whereby he identified the voice of Sandhouse. There were two telephone conversations perhaps on the same day or a day apart. Sandhouse was inquiring with reference to whether or not there could be a compromise of the unpaid irrigation assessments on the school land leases in Section 36, and what procedure should be followed to obtain a reduction, intimating that he was calling in behalf of his client Linch and representing him in this matter.

"To maintain an action for fraudulent representations, it is not only necessary to establish the telling of the untruth, knowing it to be such, or that it was told without knowledge of the facts, but also to prove that the plaintiff had a right to rely upon it, and did so rely, and altered his condition because thereof, and suffered damages thereby." Dyck v. Snygg, 138 Neb. 121, 292 N. W.

119. See, also, Beltner v. Carlson, 153 Neb. 797, 46 N. W. 2d 153.

"It is a general rule that fraud must relate to a present or preexisting fact, and cannot ordinarily be predicated on unfulfilled promises, or statements as to future events. See Palmetto Bank & Trust Co. v. Grimsley, 134 S. Car. 493, 133 S. E. 437, 51 A. L. R. 42, and notes." Theno v. National Assurance Corporation, 133 Neb. 618, 276 N. W. 375. See, also, Beltner v. Carlson, *supra.*

One of the essential elements of fraud practiced by means of false representations is that the representation must be concerning a matter material to the contract. See McNeny v. Campbell, 81 Neb. 754, 116 N. W. 671.

A person is justified in relying upon a representation made to him in all cases where the transaction is a positive statement of fact, and where an investigation would be required to discover the truth. See, Sic v. Loup River Power Dist., 136 Neb. 506, 286 N. W. 700; Foley v. Holtry, 43 Neb. 133, 61 N. W. 120; Perry v. Rogers, 62 Neb. 898, 87 N. W. 1063.

Where a party is induced to his damage to enter into a contract by false and fraudulent representations of the other party, and where such false and fraudulent representations have been relied on as the inducing cause for entering into such contract, and where such representations are of facts peculiarly within the knowledge of the party making them, and not mere expressions of opinion, the party so defrauded may elect whether he will stand by the contract or rescind it. See Perry v. Rogers, *supra.*

We believe, under the evidence and the authorities heretofore cited, the representations as made in the instant case constituted evidence of fraud and related to a present fact, and concerned a matter material to the contract here involved. The telling of the untruth by the defendant Carlson to his agent Calderwood, who made the same representations to Linch at Carlson's direction, was established, Carlson knowing it to be

such, and was such a representation that Linch had a right to rely on it, and did so rely to his damage.

Contention is made that the plaintiff Linch was obligated to examine the public records to ascertain what taxes, if any, were assessed against the land covered by the contract and the school lease lands in Section 36 here involved. In this connection, a party may rely upon a statement as to a fact made to him by another as a basis for a mutual engagement, where the facts are unknown to him but known to the other and are made for the purpose of inducing a reliance thereon, even though the statement is of a fact concerning a matter of public record. See, Crawford v. Armacost, 85 Wash. 622, 149 P. 31; Loverin v. Kuhne, 94 Conn. 219, 108 A. 554, 33 A. L. R. 848.

It is generally held that fraud may be predicated on false representations or concealments, although the truth could have been ascertained by an examination of public records. As otherwise expressed, the general rule is that the mere fact that public records, if examined, would show the representee that representations of fact are false does not preclude his establishing fraud, because he is under no duty to make such examination. See, Loverin v. Kuhne, *supra;* Lynch v. Palmer, 237 Mass. 150, 129 N. E. 374, 33 A. L. R. 842; Hoock v. Bowman, 42 Neb. 80, 60 N. W. 389, 47 Am. S. R. 691.

The purpose of the recording acts is to afford protection not to those who make fraudulent misrepresentations but to bona fide purchasers for value. And the party to whom false representations are made is not held to constructive notice of a public record which would reveal the true facts. See Seeger v. Odell, 18 Cal. 2d 409, 115 P. 2d 977, 136 A. L. R. 1291.

We conclude that the plaintiff Linch was under no obligation under the evidence as heretofore set out to examine the public records as contended for by the defendant Carlson.

Regarding telephone conversations, it is well estab-

lished that communications by telephone are admissible in evidence where otherwise relevant to the fact or facts in issue, provided the identity of the person with whom the witness spoke or the person whom he heard speak is satisfactorily established. See 20 Am. Jur., Evidence, § 365, p. 333, § 368, p. 336.

"The conversations, relating to a contract, had between the parties thereto by telephone may be received in evidence, where the witness testifies positively that he recognized the person, with whom he was talking, by his voice; and the probative force of such evidence is a question for the determination of the court or jury, as the case may be." National Bank of Ashland v. Cooper, 86 Neb. 792, 126 N. W. 656.

The trial court sustained objections to the admissibility of telephone conversations and offers of proof in evidence on the grounds that the same were incompetent, irrelevant, and hearsay. In this connection there is nothing in the record to disclose that attorney Sandhouse who called the witness Rhodes, if such be the fact, represented the plaintiff Linch as attorney or agent with reference to the unpaid irrigation assessments on the school land leases in Section 36. He was employed by Linch only to examine abstracts of title with reference to the 4-P ranch involved in the contract. He had previously examined abstracts of title for Linch on a ranch he purchased in 1944. There is no evidence to disclose that the plaintiff Linch had any knowledge during the time the contract was drafted that there were unpaid irrigation assessments on the school land leases in Section 36, and at the time the telephone conversations were alleged to have been had. The attorney Sandhouse was employed by Calderwood and paid by him to draft the contract between Linch and Carlson. The plaintiff Linch was led to believe, through Carlson's agent Calderwood, that the unpaid irrigation assessments on school land leases on Section 36 would be taken off and canceled, or in any event they would not

exceed $1,000. This Linch agreed to as no one could tell whether the ranch was worth $87,500 or $88,500.

We conclude under the circumstances the trial court properly sustained the objections to the admissibility in evidence of the telephone conversations.

For the reasons given in this opinion the judgment entered on the verdict by the trial court is affirmed.

AFFIRMED.