The EMPLOYERS' LIABILITY ASSURANCE CORPORATION, Limited, Appellant,

v.

L. J. MARCOTTE INSURANCE AGENCY, a partnership, etc., et al., Appellees.

No. 17108.

United States Court of Appeals Eighth Circuit.

March 8, 1963.

Rehearing Denied April 1, 1963.

G. L. DeLacy, Omaha, Neb., made argument for appellant, and filed brief with Kennedy, Holland & Svoboda, Omaha, Neb.

William J. Hotz, Jr., of Hotz, Hotz & Taylor, Omaha, Neb., made argument for appellee, and filed brief with Tyler B. Gaines, Omaha, Neb.

Before SANBORN, VAN OOSTERHOUT and MATTHES, Circuit Judges.

SANBORN, Circuit Judge.

The Employers' Liability Assurance Corporation, Limited (Employers), a foreign insurance company, as a subrogee and assignee of Mutual Benefit Health & Accident Association (Mutual) and United Benefit Life Insurance Company (United), both of Omaha, Nebraska, brought this diversity action on February 8, 1957, against L. J. Marcotte Insurance Agency (Marcotte Agency), a partnership, and its members to recover the amount of a loss suffered by Mutual and United which Employers, by the terms of an "Insurance Companies' Blanket Bond" which it had issued to them, was obliged to pay. The Marcotte Agency was alleged to be liable for the loss, which had been occasioned by the dishonesty of an employee of the Agency in connection with the adjustment of claims on policies which it, as General Agent for Mutual and United, had written for those companies. The Marcotte Agency denied liability. The case was tried to the District Court, without a jury, upon a Stipulation of Facts and the evidence of two witnesses, one of whom was the Vice-President in charge of claims for Mutual and Claims Manager for United, and, the other, Robert D. Marcotte, one of the partners in the Marcotte Agency.

The District Court concluded "that the direction and control which Mutual and United exercised over the adjuster [the employee of the Marcotte Agency who had defrauded the companies] was of such a degree as to clearly preclude these companies from holding the Marcotte Agency responsible to them for the consequences of his actions." Judgment was entered for the defendants, and the plaintiff has appealed.

It is unnecessary to state in complete detail the underlying facts. The most concise and easily understandable statement of how the loss came about is found in the sworn Proof of Loss dated October 1, 1956, submitted to Employers by Mutual and United. It reads as follows:

"It is hereby certified that the undersigned [Mutual and United] has sustained a loss through the dishonesty of Richard O. Channel employee of Marcotte Insurance Agency employed at said Marcotte Insurance Agency in the position of Claim Auditor.

"The circumstances and evidence of such loss are as follows: Richard

O. Channel, Claim Auditor at the Marcotte Insurance Agency of Omaha, Nebraska, representing Mutual Benefit Health and Accident Association and United Benefit Life Insurance Company, handled claims originating through this agency in its territory. In such position he was authorized to draw drafts against the Companies in payment of valid claims. From October, 1955 to June, 1956, Channel drew various drafts on the Companies in payment of claims. In some of these cases it has been found that Channel created false proofs in excess of the actual liability under valid claims. In other cases, he established false claims and proofs. Drafts issued by him under both situations were honored by the Companies, and the total amount of such drafts constitutes the amount of this claim. In the case of each draft Channel forged the endorsement of the insured and retained the proceeds personally.

"The dates and amounts of such loss are set forth in detail on the reverse hereof. * * *"

The total loss aggregated $12,111.23.

The liability of the Marcotte Agency and its members for this loss depends upon whether, under the law of Nebraska, they were answerable to Mutual and United for the misdoings of the Agency's employee Channel.

During the period in suit, the Marcotte Agency was a General Agent of Mutual and United, and was authorized "to write business through sub-agents" for those companies.

So much of the Stipulation of Facts as seems pertinent is set out in the margin.[1]

---

"VII.

1. "That prior to October, 1955, defendant Agency, with the knowledge, consent and approval of Mutual and United, employed one Richard O. Channel, also known as R. O. Channel, and herein referred to as Channel, and paid him compensation as an employee. That Channel's duties were known to Mutual and United, and were to process claims made upon policies issued through defendant Agency in the manner and under procedures determined by Mutual and United; that under the procedure so determined Channel received notice of claims; completed Mutual-United Form U112A, a copy of which is hereto attached, and identified as Exhibit 'D', forwarded said Form U112A to Mutual-United for approval; after the approval of Mutual or United, received Mutual-United Form M112, copy of which is hereto attached and identified as Exhibit 'E'; completed portions of said form; assembled supporting information, including medical reports, medical, hospital and other statements of charges, and signed statements of claim; and returned said completed Form M112 with supporting documents to Mutual or United for approval. Prior to October, 1955, Mutual and United furnished a supply of drafts for the payment of claims, in the form attached, identified as Exhibits 'F' and 'G', and a copy of the signature of the said Channel was furnished Mutual-United. Under the procedures for processing claims, determined by Mutual and United, Channel computed benefits under the applicable policy for which claims had been made, prepared and signed drafts in payment thereof, and delivered such drafts to the payee thereon named, and at the same time prepared a stub showing the information contained on said draft, and submitted the same to Mutual and/or United for approval. No request or requirement was at any time made by Mutual or United that defendant agency supervise or audit the activities of the said Channel. Prior to the loss in question, Channel had processed many claims, and issued drafts therefor, which claims were approved and the drafts paid by Mutual and/or United, in the manner hereinabove and hereinafter described.

"VIII.

"That prior to October, 1955, Mutual and United separately agreed with The Omaha National Bank as follows: That upon presentation of any claim draft of Mutual or United, The Omaha National Bank agreed to and did promptly deliver such drafts, which had been presented for payment, to Mutual or United, as the case required; that Mutual and United then, in all cases, notified and instructed the Omaha National Bank as to the drafts to be honored and paid, and charged to their respective accounts and the drafts to be dishonored and rejected for payment. That no draft was paid by The Omaha National Bank until the same had been approved for payment by Mutual

Mr. LeClair, Vice-President in charge of claims for Mutual and Claims Manager for United, in his testimony described how policy claims against those companies were processed. After testifying that "Mr. Channel was Claim Auditor in the Marcotte Agency," the following questions were asked Mr. LeClair, and the following answers given:

"By the Court: What do you mean by 'Claim Auditor'?

"The Witness: Well, Mr. DeLacy [counsel for appellant] has referred to him as an adjuster. They are claim payers. That is, they take the claim and audit it. In other words,

they check whether the diagnosis is covered by the policy, and then check to see what is payable under the terms of the policy in accordance with the claim.

"By the Court: And then draw a draft?

"The Witness: And then draw a draft. Mr. Channel would draw this draft, a copy of which must be sent immediately to the home office, together with the file, and the form 112, which I believe has been referred to in one of the exhibits here. Form 112 would show the nature of

or United: The Omaha National Bank had no record of the signature of Richard O. Channel, or any other claim agent of Mutual or United; that these facts and the arrangement of the said Mutual and United with The Omaha National Bank were known to all the parties to this action.

"IX.

"Upon receipt of Form U112A, Mutual and United ascertained whether the policy upon which the said form gave notice of claim was in force, and the coverage provided thereby, and recorded this information, among other places, on Form M112, and forwarded said Form M112 bearing such information to the adjuster from whom notice of claim, Form U112A, was received. That upon receipt of the stub upon which was recorded the information appearing on the draft of Mutual and United, from the said adjuster, and upon receipt of the completed draft bearing the signature of such adjuster, including the said Channel, from The Omaha National Bank, the said Mutual and United made a determination as to whether or not such draft should be honored and paid, and so advised The Omaha National Bank.

"X.

"That during the period between October, 1955, to and including June, 1956, the said Channel prepared numerous 'Notice of Claim' forms, Form U112A (Exhibit 'D'), some of which forms were false and were fabrications, the name of a real policyholder, a real policy number, having been filled in on said form by the said Channel, with false information relative to a claim which did not in fact exist. That during the same period, the said Channel did, in addition, prepare the said Form U112A (Notice of Claim)

in respect to actual claims which were in fact made, and which were in fact true and valid claims. That during the said period, the said Richard O. Channel received from Mutual and from United Form M112 in response to notices of claims prepared and forwarded by him, both in respect of false claims and true claims, and that the said Channel completed the adjuster's portion of the said Form M112 (Exhibit 'E') in the case of both true and false claims. That during said period, the said Channel prepared, signed, and delivered to the payee, by mail or otherwise, drafts in payment of true claims, for the benefits actually due by virtue of such claims, and in addition, during said period, the said Channel completed and signed drafts for payment of benefits which were not in fact due the policy-holder under the false claims hereinabove mentioned, and further, completed and signed drafts for payment of benefits in excess of the benefits actually due under true claims. That the drafts prepared and signed by the said Channel, in payment of false and exaggerated claims, were not delivered by the said Channel to the payee named upon such drafts, but were in fact retained by the said Channel, endorsement of the payee forged thereon, the drafts cashed, and the proceeds of such drafts retained by the said Channel and fraudulently converted to his own purposes and use. That none of the parties to the action had actual knowledge of the preparation and submission of such false and exaggerated claim papers, and of such false and exaggerated claim drafts, during the said period. The fact that some claims were false or exaggerated could have been discovered by investigation and/or inquiry."

the audit made of the claim by the adjuster or the auditor.

"The home office then reviewed that file which contained the proofs of loss bills, if there were bills, the form 112, and a copy of the draft. The check at the home office was made to see that the claim was payable, the policy was in force, that this particular claim came within the terms of the policy, and then that the amount paid was correct. If that were true, it was approved, and this in turn went into a section in our Claim Department for the making up of a stat card which, in effect, became our draft stub. The stat cards are then filed until the original draft comes through the Omaha National Bank and is delivered to us for payment.

"This is done each day, and we are required to cover all of those drafts within twenty-four hours by our check to the Omaha National Bank.

"That is the system we use.

"Q. Do you have many of these checks or drafts? Do they run into numbers?

"A. 3500 a day, approximately, is average."

Mr. Robert D. Marcotte, one of the partners in the Marcotte Agency, testified that Channel was trained for his work by Mutual and United at the time he was employed by the Agency, and before reporting to its office. Asked if he knew what the course consisted of, he answered:

"A. In a general way, it consisted of training in all the duties he would perform in our agency, auditing claims, paying claims; all the procedures that are set out in multiplicity in all of the procedural bulletins that the company has covering all these subjects.

"Q. That was all according to procedures and directives laid down by your insurance companies, Mutual and United?

"A. Absolutely. That is the only way we could operate."

It seems to us that all of this can be summed up by saying that Channel, who was employed by the Marcotte Agency to audit, adjust and secure the payment of claims of policyholders in Mutual and United who had procured their policies through that Agency, was required to process such claims in exact conformity with the rules and practice of those companies applicable to all persons who were permitted to audit and adjust policy claims.

In Restatement of the Law, Second, Agency, § 261, page 570, the general rule relating to the liability of a principal for a fraud committed by an agent or servant is stated as follows:

"A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud."

Under "Illustrations" following that section, on page 571, paragraph 2 reads as follows:

"2. A, local manager of P, a telegraph company, gives padded statements of account to T, a patron of the company, who pays in accordance with such statements. A deposits the money to P's credit, withdraws the surplus, and absconds. P is subject to liability to T for the excessive payments."

Section 262, on page 571, reads as follows:

"A person who otherwise would be liable to another for the misrepresentations of one apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this."

Under "Comment", following that section, we note, on page 573:

"c. Contributory negligence on the part of the deceived person is

not generally recognized as a defense. However, if a third person should know or otherwise has notice that an agent is acting for his own purposes or is otherwise violating his authority, the principal is not liable."

In 3 Am.Jur.2d, Agency, § 267, page 631, it is said:

"The well-settled general rule is that a principal is liable civilly for the tortious acts of his agent which are done within the course and scope of the agent's employment."

In support of this statement, many authorities are cited (page 631), including Gleason v. Seaboard Air Line Ry. Co., 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (the leading federal case on the subject), and the Nebraska cases of Wilson v. Thayer County Agri. Society, 115 Neb. 579, 213 N.W. 966, 52 A.L.R. 1393, and Berkovitz v. Morton-Gregson Company, 112 Neb. 154, 198 N.W. 868, 33 A.L.R. 85. The text-writer goes on to say, in § 267, page 631:

"However, this rule is not grounded on agency principles, which is evident from the holdings that a principal may be held for his agent's tort committed in the course and scope of the agent's employment even though the principal does not authorize, ratify, participate in, or know of, such misconduct, or even if he forbade or disapproved of the act complained of."

In 3 C.J.S. Agency § 255, page 186, is found the following statement:

"In addition to acts which he has expressly directed his agent to commit, the principal is liable for all other tortious acts committed by the agent while acting within the scope of his authority, * * *."

In § 255, page 187, it is further said:

"* * * Tested by reference to the intention of the principal, neither negligence nor fraud is within the scope of the agency; but tested by the connection of the act with the property and business of the agency, fraud is as much within the scope of the agency as negligence."

In Gleason v. Seaboard Air Line Ry. Co., supra, 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415, the Supreme Court of the United States reversed a decision of the Circuit Court of Appeals for the Fifth Circuit in Seaboard Air Line Ry. Co. v. Gleason, 21 F.2d 883, in which the Court of Appeals, in reliance on language in Friedlander v. Texas and Pacific Ry. Co., 130 U.S. 416, 9 S.Ct. 570, 32 L.Ed. 991, had held, in effect, that the Railway Company was not liable for a swindle perpetrated on Gleason by one of its employees through the issuance of a forged bill of lading followed by a false report of the fictitious arrival of the nonexistent shipment described in the forged bill. The Court of Appeals had said that, under the undisputed evidence, "the acts of McDonnell [the swindler] with reference to the forged bill of lading were done to effectuate an independent fraudulent purpose of his own, in utter disregard of the object for which he was employed, not for the purpose of furthering his employer's business, and that in doing those acts he was acting for himself alone, and not in behalf of his employer or the latter's business," and that, "[u]nder the general rule prevailing in the federal courts, an employer is not liable for such conduct of his employee." (Page 884 of 21 F.2d.) The Supreme Court, after saying that the limitation upon the doctrine of *respondeat superior* applied by the lower court finds little support in the authorities, and that the state courts have very generally reached the opposite conclusion in holding the principal responsible for a false statement or other misconduct of an agent acting within the scope of his authority, regardless of a secret purpose or motive, went on to say (pages 356–357 of 278 U.S., pages 162–163 of 49 S.Ct., 73 L.Ed. 415):

"And we think that the restriction of the vicarious liability of the principal adopted by the court below is supported no more by rea-

son than by authority. Undoubtedly formal logic may find something to criticize in a rule which fastens on the principal liability for the acts of his agent, done without the principal's knowledge or consent and to which his own negligence has not contributed. But few doctrines of the law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own. Shaw, C. J. in Farwell v. Boston and Worcester Railroad Corporation, 4 Metc. 49, 55; Bartonshill Coal Co. v. Reid, 3 Macq., 266, 283. See Pollock, Torts (1887) 67, 68; Salmond, Jurisprudence, 2d ed. 1907, 381. The tendency of modern legislation in employers' liability and workmen's compensation acts and in the Bills of Lading Act cited, and of judicial decision as well, has been to enlarge rather than curtail the rule.

"Granted the validity and general application of the rule itself, there would seem to be no more reason for creating an exception to it because of the agent's secret purpose to benefit himself by his breach of duty than in any other case where his default is actuated by negligence or sinister motives. In either case the injury to him who deals with the agent, his relationship and that of the principal to the agent's wrongful act, and the economic consequence of it to the principal in the conduct of whose business the wrong was committed, are the same."

That an employer may be held answerable for unanticipated, unauthorized and inexcusable acts of an agent, which are directly opposed to the interests of the employer but are within the scope of the agent's apparent authority, is indicated by the case of Bowman v. Home Life Insurance Company, 3 Cir., 243 F.2d 331. There the insurance company was sued, under Pennsylvania law, for the misconduct of a "field underwriter" in deceiving women applicants for insurance into believing that he was a doctor and authorized to examine them physically. The Court expressed the opinion that it could be found that the agent "was armed by his principal with the means to do what he did and that the excess of his activities beyond his authority is at the principal's risk." (Page 335 of 243 F.2d.)

We find nothing in the Nebraska authorities that indicates to our minds that there has been any local deviation from the generally accepted rule as it is ordinarily stated and applied.[2]

The Nebraska case which seems to us most closely analogous to this one is Berkovitz v. Morton-Gregson Company, supra, 112 Neb. 154, 198 N.W. 868, 33 A.L.R. 85. Berkovitz had a retail meat-market in Omaha and bought meat from the Morton-Gregson Company, a Nebraska meatpacker. The company had a salesman and bill collector in Omaha by the name of Kleeberger. He presented padded bills to Berkovitz, and retained the excess amounts he collected ostensibly for his employer. Berkovitz sued the company for the amount he had overpaid to Kleeberger. The Supreme Court of Nebraska, in holding the defendant liable, said (page 869 of 198 N.W.):

"Whether the acts of Kleeberger in altering and raising the statements of account and collecting excessive amounts, which he appropriated to his own use, can be said to be within the ostensible or apparent scope of his authority is a more se-

2. The appellant, in support of its claim, cites the following Nebraska cases: Bull v. Mitchell, 47 Neb. 647, 66 N.W. 632; Rehmeyer v. Lysinger, 109 Neb. 805, 192 N.W. 337; Berkovitz v. Morton-Gregson Company, 112 Neb. 154, 198 N.W. 868, 33 A.L.R. 85; Kamrath v. Gilbert, 119 Neb. 51, 227 N.W. 148; Linch v. Carlson, 156 Neb. 308, 56 N.W.

2d 101. The appellees find some comfort in the application of the rule in the following cases: Division No. 1 Railway Employees Department, A.F.L. v. American State Bank, 113 Neb. 196, 202 N.W. 232; Burchmore v. Byllesby & Co., 140 Neb. 603, 1 N.W.2d 327; Crane v. Whitcomb, 160 Neb. 527, 70 N.W.2d 496.

rious question. While the statements of account were correctly made out at the home office and sent to Kleeberger for collection, the latter, when he presented the altered and raised statements of account to plaintiff, was certainly acting for and on behalf of his principal, and was within the line of his employment. So far as plaintiff was concerned, Kleeberger, to all appearances, stood as the agent and representative of Morton-Gregson Company, and was acting within the apparent scope of his authority. Morton-Gregson Company was without question a reputable business concern, and plaintiff, we think, was justified in the belief that its agent was reliable and trustworthy, and was warranted in the belief that the trusted agent of the Morton-Gregson Company was presenting accurate and true statements of his account. That he relied on the statements as being accurate and true was beyond question. We think he was justified in so acting. The fraud was perpetrated by Kleeberger while acting within the apparent scope of his authority.

"In McFadden v. Lynn, 49 Ill.App. 166, it is held:

" 'A principal holding out an agent as having authority to represent him, and thereby asserting or impliedly admitting that the agent is worthy of trust and confidence, is bound by all his acts within the apparent scope of the employment. Hence, the princpal may be held for the fraudulent acts of the agent.' "

At the close of the trial, counsel for the defendants moved for judgment in their favor on the ground that it appeared from the evidence "that the man Channel, whose actions resulted in the loss complained of, was acting for plaintiff's insureds Mutual and United, at all times, and was their representative, and that the plaintiff is in the same position as its insureds, and cannot complain of the loss caused by its own agent." Ob-

viously, if Channel was an employee or agent of Mutual and United while he was engaged in defrauding them in connection with the adjustment of policy claims, the Marcotte Agency owed them nothing and owes the plaintiff nothing.

The points argued by the defendants are stated in their brief as follows:

"I.

"An agent, such as Marcotte Insurance Agency, is not liable to the principal, Mutual and United, or one standing in the place of principal, such as the Employers' Liability Assurance Corporation, for the fraudulent acts of a sub-agent, Channel, if such agent has not contributed to the fraud and if the appointment of the sub-agent was authorized by the principal, either expressly or impliedly. Such authorization will be implied if the principal knows from the surrounding circumstances and customs that it will be necessary for the agent to appoint a sub-agent in order to properly carry out his duties.

"II.

"The fraudulent acts of an employee or sub-agent, such as Channel, which are committed solely for personal reasons and not for any purpose connected with the furtherance of the principal's business are not within the scope of the employee's or sub-agent's employment, and the principal will not be held liable for the fraud if he has not contributed to it through his authorization or ratification of the agent's or employee's acts or through his negligence in choosing such sub-agent or employee."

Channel was unquestionably employed by the Agency to audit, adjust and procure payment of the claims of customers of the Agency who had purchased policies in Mutual and United from the Agency and were looking to it for the adjustment of their claims. Channel had been hired by the Agency, worked in the office of

the Agency, was paid his salary by the Agency, adjusted claims for the Agency on policies written by it, and was eventually fired by the Agency when his fraudulent acts were discovered.

It is equally true that Mutual and United determined the procedure that Channel and all others authorized to audit and adjust claims were to follow, and that the companies furnished all the necessary forms and handled drafts drawn by him in the same way that drafts of their own claim auditors and adjusters were handled and subject to the approval of the home offices. It is also true that they gave Channel preliminary training in the processing of claims, and that the procedure prescribed by Mutual and United was carried out by Channel and examined and approved by them before drafts were paid. The companies also defrayed part of Channel's expenses when he was obliged to leave Omaha to investigate claims in the field.

The writer of this opinion is convinced that the only conclusion which reasonably can be drawn from the evidence, under the applicable law, is that Channel was an employee of the Marcotte Agency; that, in defrauding Mutual and United, he was acting within the scope of his apparent authority as an adjuster of claims on policies written by the Agency; that the Agency was liable for the loss in suit; and that the plaintiff is, as a matter of law, entitled to the judgment for which it prays.

The associates of the writer, however, are both of the opinion that, while Channel was shown to have been acting within the scope of his apparent authority while defrauding Mutual and United, there was sufficient evidence to sustain the trial court's finding that "the direction and control which Mutual and United exercised over the adjuster [Channel] was of such a degree as to clearly preclude these companies from holding the Marcotte Agency responsible to them for the consequences of his actions," and that it cannot be held that the supervision exercised by those companies over Chan-

nel's operations was not such as to absolve the Marcotte Agency from liability to them for the loss caused by Channel.

The judgment appealed from is therefore affirmed.